# CHARLESTON.

Bluestone Coal Co. v. Bell *et al.*

Submitted June 19, 1893. Decided November 22, 1893.

1. Lease.

Where a lease is executed to a party of all coal, timber and mineral privileges on a certain tract of land, for the term of ninety nine years thence ensuing, the lessee agreeing to pay ten cents per ton for the coal mined and shipped therefrom, and for all such timber as said lessee may think merchantable, which may be cut, shipped, sawed or moved from said leased premises, fifty cents per one thousand square feet of lumber of inch thickness, and a proportionate sum for other thicknesses, or twenty five cents per tree, at the discretion of said lessees or their assigns, no time being fixed for the commencement of operations, the lessor has a right to presume that said operations will be commenced in a reasonable time.

2. Lease—Laches.

If nothing has been done under said contract for the period of seventeen years from the date of the contract, the lessor has a right to presume the contract has been abandoned, and said lessee or his assigns can not, after having been guilty of such laches, restrain said lessor from cutting and using the timber on said land by enjoining him from cutting and removing the same.

3. Lease—Rescission of Contract.

Where it is made apparent that said lease was entered into under a mutual mistake as to the existence of a workable vein of coal in said land, and that said timber contract was induced by the belief that such coal did so exist, and to aid the lessee in his mining operations, said contract should be rescinded, not only as to the coal, but as to the timber.

4. Lease—Laches—Specific Performance.

In order that a party may have specific performance of a con-

tract, he must not be in default, but must show himself to have been ready, eager, prompt and desirous of maintaining his rights. The rule of laches is more strictly applied in cases of this character than in ordinary suits for accounts, *etc.*

A. C. DAVIDSON and OKEY JOHNSON for appellant:

I.—*Chancery has no jurisdiction of this case.*—7 W. Va. 223; 20 W. Va. 175.

II.—*The claim of the plaintiff is without equity*—1 Lev. 111.

III.—*The lease was procured by false and fraudulent misrepresentations.*—67 Am. Dec. 675; 77 Am. Dec. 687; 19 W. Va. 438; 32 Gratt. 312; 77 Va. 540; 78 Va. 65; 83 Va. 397; 5 Am. St. Rep. 285 n.

*Plaintiff can not claim to be an innocent purchaser.*—62 Am. Dec. 402; 65 Am. Dec. 314; 15 Or. 385; 32 Am. Dec. 740; 55 Am. Dec. 147; 51 Am. Dec. 675; Sto. Eq. Pl. §§ 54, 28, 806, 852, *et seq.*

IV.—*If not fraud there was a mutual mistake.*—15 Am. & Eng. Ency. L. 628, *et seq.*

V.—*The lease was abandoned by plaintiff and those under whom he claimed.*—40 Am. Dec. 464; 83 Va. 409; 83 Va. 547.

VI.—*The lease was given on condition that it should be void, if R. R. was not built in five years.*—34 W. Va. 397.

J. S. CLARK and A. W. REYNOLDS for appellee cited 2 Pom. Eq. Juris. § 855; 1 Sto. Eq. Juris. (9th Ed.) § 150; 24 W. Va. 741.

ENGLISH, PRESIDENT:

On the 28th day of March, 1872, David Bell of Mercer county entered into a written agreement with Eli Bailey, Harrison W. Straley, David E. Johnston and Isaiah Bee, whereby he demised and leased unto them their personal representatives and assigns all coal, timber and mineral rights and privileges whatsoever contained on, in and beneath the surface of all and every part, portion and acre of his, the said David Bell's, farm-lands, ground, property, and possessions, lying and being in the county of Mercer, W. Va., on the waters of the Bluestone, adjoining James Bell, Green Belcher, and Calfies and others, and containing one hundred and fifty acres, be the same more or less,

to have and to hold the same from the date of said agreement for the period of ninety nine years thence ensuing; and the said Bailey, Straley, Johnston and Bee, their personal representatives and assigns, agreed to well and truly pay or cause to be paid to the said David Bell, the lessor thereof, during the said term, period and space mentioned, for and in consideration of said demise, a rent of ten cents per ton of two thousand two hundred and forty pounds for each and every ton of coal and minerals mined and shipped therefrom; and, for all such timber as the lessees might think merchantable, they agreed to pay or cause to be paid to the said David Bell, his personal representatives or assigns, when the same was shipped, cut, sawed or moved from said leased premises, at the rate of fifty cents per one thousand square feet of lumber of inch thickness, or a proportionate sum for other thicknesses, or twenty five cents per tree, at the discretion of the lessees, their personal representatives, etc.; and the said Bailey, Straley, Johnston and Bee, their personal representatives, successors and assigns, might and should have and enjoy full and free access, ingress and egress into or beneath and over said lands for the purpose of opening, mining and shipping the coal and other minerals thereon and therein, and for the cutting, sawing and removing lumber, and to build and erect the necessary buildings and machinery to operate and work the same, with undisturbed right of way for all necessary roadways to and from their or his said mines, timbers and works; and the further consideration of one dollar to him in hand paid by the said Bailey, Straley, Johnston and Bee, the receipt whereof was thereby acknowledged by the said David Bell, the same to be binding upon his heirs, administrators, successors and assigns, which agreement was acknowledged by the parties thereto, and was admitted to record in the recorder's office of Mercer county on the 23d day of September, 1872.

By successive transfers at different dates, the said lease came into the hands of the Bluestone Coal Company, the appellee, on the 30th day of June, 1884, and some time in the year 1889 said Bluestone Coal Company filed its bill in the Circuit Court of Mercer county against said David Bell

and Ralph Strader, setting forth therein the terms of said agreement, and the various transfers thereof, and alleging that under said lease it had the exclusive privilege of cutting, manufacturing, and using the timber on the said land during the said term of ninety nine years, and that said David Bell and those claiming under him had nothing whatever to do with the timber growing upon said leased premises, and had no more right to interfere with the same in any manner whatever, than they would have, if the plaintiff was the absolute owner of the said leased premises in fee simple, until after the said period of ninety nine years.

Said plaintiff further alleged that the said David Bell had entered into some sort of an arrangement with the defendant Shrader, under which they were cutting, manufacturing and destroying the timber upon the said leased premises, and that the said timber was not being cut, manufactured and destroyed as aforesaid for farming and building purposes on the said leased premises;—that it was the owner of a large area of coal lands in the immediate vicinity of the said leased tract of land and premises, and was then extensively engaged in mining coal from the said lands;—that, in order to enable it to carry on its said mining operations, it was necessary to use in the said mines a large amount of timber;—that the timber in the vicinity of its said mines rapidly being used up, and that, in order to be able to continue its business of mining, it will be obliged to continue the use of large quantities of timber, and that, in order to meet the said necessity for timber, it was of great importance to it that the timber on said leased premises should be preserved to meet the future demands aforesaid for timber;—that, if the said Bell was permitted to cut, manufacture and destroy the timber from said leased premises, and plaintiff was forced to resort to its action for damages against said Bell, the present market value of the timber would be nothing to compare with the special value of the said timber to the plaintiff for the purposes aforesaid;—that the value of said timber to the plaintiff was many times its present market value;—and that, if the defendants were permitted to cut, manufacture

and destroy the said timber, it would be compelled in the future to supply the place of the said timber by buying and shipping timber from a great distance at ruinous freight rates, and that it would be irreparably damaged thereby.

And plaintiff charged upon information and belief that, unless the defendants were restrained by a court of equity from so doing, they would cut, manufacture, and destroy all the timber upon the said leased premises, and it would suffer irreparable damage thereby; and plaintiff prayed that said David Bell and Ralph Shrader, and all other persons, their employes, servants, agents *etc.*, be restrained by injunction from cutting, manufacturing or in any manner interfering with or destroying the timber on the said leased premises during the said term of ninety nine years, and for general relief.

This bill was sworn to on the 27th day of June, 1889, and an injunction was awarded on the 1st day of July, 1889, by the judge of the said Circuit Court in vacation, restraining said Ralph Shrader and David Bell their agents and servants from cutting sawing or removing from the one hundred and fifty acres of land, in the bill and exhibit A described, the timber growing thereon except for farming and building purposes needed by said David Bell personally on said land, until the further order of said Circuit Court, or a judge in vacation.

On the 18th day of November, 1889, the defendant David Bell demurred to the plaintiff's bill and also filed his answer, which answer was replied to generally. In his answer the said David Bell admitted the execution of the paper exhibited with plaintiff's bill, which he avers was miscalled a lease, and alleges that in fact said paper, though such in form, was not in legal effect a lease, but that it was a mere optional contract, speculative in its character, entered into on the part of said Bailey and others for purely speculative purposes, and for a long number of years it had been abandoned, and was only sought to be revived by David E. Johnston and H. W. Straley and their associates after new events and developments, not contemplated when the paper was executed, made it desirable on their part to do so. That said paper was executed in 1872, when it was

expected to secure the construction of a railroad from Hinton up New river to Bluestone; thence up Bluestone; the parties, at the time said paper was executed, asserting, and the defendant believing, that he had coal on his land, and that said railroad would be built within the then short period of five years from the date of said paper;—that the scheme of constructing said railroad never materialized, and the whole matter and all so-called contracts of every kind entered into on these facts were completely abandoned;—that some years afterward the Norfolk & Western Railroad Company went to work in good faith to build a railroad to Bluestone, to develop its immense coal fields lying north of the Bluestone river, and gave evidence of business and wonderful development by building a mining town and opening mines at what is now Pocahontas;—that defendant's land happened to lie south of Bluestone river, where it is considered by all parties there is no coal; and said Straley and Johnston did not buy the defendant's coal land, as they did that of others lying north of Bluestone river, but went to work deliberately to speculate on said old paper by assigning it to the Bluestone Coal Company in violation of right and justice;—that the real consideration which induced the defendant to execute said paper was the representations relied on and believed: (1) that said railroad up Bluestone would be built in five years; (2) that defendant's land contained valuable and extensive coal veins, which said Bailey and others would proceed promptly to work and pay the defendant large sums for his royalty of ten cents per ton, as per stipulation in the paper; (3) in view of the above benefits, defendant agreed also to part with his timber at the nominal price named; (4) there was no other consideration whatever, either actual or nominal, which induced the execution of said paper; the one dollar named was in fact not paid;—that nothing had ever been done by any of the parties toward carrying out the real contract; in fact, its performance was impossible at the very time of its execution; the real subject-matter and substantial inducement to the contract being the supposed existence of valuable coal veins on said lands, when none such in fact existed; so that, by the mutual mistake of all par-

ties concerned, they went through the form of contracting about a supposed subject-matter which had no existence, and the supposed existence of which was the real and only inducement to the so-called contract; that, as to the timber, defendant never would have entered into any such agreement to sell his timber at the nominal price named, had he for a moment thought that he was dealing about the timber alone; and that in view of these facts, the said Bailey, Johnston and others having done absolutely nothing towards carrying out said contract on their part the real inducement to the contract, namely, the existence in the said land of coal, having failed, and the timber of defendant having become valuable from other causes, for which the said Bailey, Johnston, and others are in no wise responsible, to now allow the pretensions of the bill would be most unjust, inequitable and unreasonable—in fact, in violation of common justice and equity.

The defendant also claimed that the plaintiff could not occupy the favored position of purchaser for value without notice, for the obvious reason that all purchasers are held to have notice of all facts, where the information they have would lead to inquiry; that the plaintiff knew or ought to have known that nothing had been done under said paper to vest any rights whatever;—that the plaintiff well knew that there was no coal on said land before it became the purchaser thereof, if a purchaser at all for value;—that it well knew from the face of the paper what was the character of the agreement, and could have ascertained the real facts by applying to the defendant, and that David E. Johnson and H. W. Straley acted as the agents of the plaintiff in making said contract, and thus had actual knowledge of all the real facts;—that said paper of March, 1872, is in legal effect virtually nothing but a contract at will, which of course must be at the will of both parties, and the failure of said Bailey and others to do anything under the contract for the long time named above, and the actual abandonment thereof, as above set forth, was equivalent to—in fact, was—an exercise of their will, which terminated and put an end to the so-called contract; that the plaintiffs had notice in contemplation of law of all this,

and were bound by it;—that the plaintiff avers in its bill that it is operating extensive coal operations on its lands north of Bluestone river, which is true, but the bill is discretely silent as to any intention on the part of plaintiff to ever do any mining on defendant's land;—that this is no oversight, for they or it well knew that there was no coal on defendant's land, but said plaintiff wants defendant's timber for its mining purposes; and he denies plaintiff's right to it.

Defendant further alleges that, in the usual course of husbandry he has had a portion of his land cleared, and the timber thereon deadened, and, in order to save it, he sold the timber, as he had a right to do, to his codefendant, Shrader;—that the land, upon which he sold his timber to Shrader is the best land on his farm, which he was clearing for agricultural purposes, and, if he can not be permitted to clear up and cultivate his farm for agricultural purposes, he will be forced to move off, and abandon his home and turn it over to plaintiff;—that before the execution of said so-called "contract" the said Bailey and others represented to him that, in the event the railroad up Bluestone river was not built in the period of five years from the execution of said lease, the said paper or lease was to be void and not binding on any one, and defendant charged that said representations were the only inducements that led to the execution of said paper on the 28th of March, 1872, especially on the part of defendant;—that said paper constitutes a cloud on his title which a court of equity would remove, and that it would be just and right for a court of equity to declare said paper or so called "contract" null and void, and that the same be cancelled and delivered to him; and he prays that it may be so declared, and for general relief.

The plaintiff filed a special replication to said answer, denying all of the matters therein alleged, constituting a claim for affirmative relief. Some depositions were taken in the cause, and on the 26th day of December, 1890, a decree was rendered in the cause, failing to pass on the demurrer, perpetuating the injunction as to the defendants, Ralph Shrader and David Bell, perpetually enjoining them from cut-

ting, sawing, and removing from the one hundred and fifty acres of land in the bill described the timber growing thereon, except for farming and building purposes needed by said David Bell, and refusing to grant the affirmative relief prayed for by said David Bell in his answer; and from this decree this appeal was obtained.

As nothing is said about the demurrer in the decree complained of, it must be presumed, that counsel for the defendant did not insist upon it in the court below; and, whether it was or not, if the plaintiff or those under whom it claims, have not by some *laches* or neglect on part of either of them failed to comply with the terms of the agreement set forth in the bill in a reasonable time, the allegations therein contained must be regarded as sufficient to entitle the plaintiff to be heard in a court of equity.

Now, then, if we turn our attention to the attitude of the parties at the time said agreement was made, and say that, at the time they were treating in regard to this one hundred and fifty acres of land, both parties were ignorant of the fact that the land contained no vein of coal, yet a casual glance over the agreement discloses the fact that the coal underlying the land was to be mined and removed, and the timber was to be cut, sawed or moved from said leased premises at the rate of fifty cents per one thousand square feet of lumber of inch thickness, or a proportionate sum for other thicknesses, or twenty five cents per tree, at the discretion of the lessees, their personal representatives or assigns, *etc.*, to be paid for when the same was shipped, cut, sawed or moved from said leased premises—an exceedingly low price for timber, and a price which it is difficult to believe a man would receive for his timber, unless he was to be compensated in some other manner for parting with it at this low price; and what man, in his sober senses, would agree that his timber should be cut, and shipped at this low price, and at any time the lessee might think proper, so it was within the period of ninety nine years, unless such agreement was coupled with another contract, as this one was, from which he could reasonably expect to derive some profit?

The defendant Bell in his answer says the real subject-

matter and substantial inducement to the contract was the supposed existence of valuable coal-veins on said lands, w m none such in fact existed; so that, by the mutual m. ike of all parties concerned, they went through the foolish form of contracting about a subject-matter that had no existence, and the supposed existence of which (viz. the coal) was the real and only inducement to the so-called contract, and that he never would have entered into any such agreement to sell his timber at the nominal price named, had he for a moment thought that he was dealing about the timber alone.

And the fact, that the agreement, on its face, shows that it contemplated the mining and removal of coal from the land at ten cents per ton shows that the agreement was made under a mutual mistake, as the defendant Bell was selling something he did not own, and the lessee was thereby purchasing something that did not exist.

David Bell, whose testimony is taken in the cause, states that, at the time said contract was entered into, he was of opinion that there were valuable coal deposits on said tract, and that he would not have contracted to sell his timber at the prices he did, if he had known there was no coal in said land, and that he agreed to these prices in order that they should have the timber for mining purposes; and I. A. Welch, another witness, who is an expert in reference to coal formations, and has had experience in the Flat Top region, in the vicinity of this land, states that there is no vein of coal of any value in this land. This evidence shows clearly that there was a mutual mistake as to the coal, which was the most important inducement to the contract, and but for which said Bell says he would never have executed it.

The further fact is disclosed by the testimony, that, in order to transport the timber from this land to the lands of the plaintiff, the Bluestone river would have to be crossed; and it would have to be carried several miles by rail; and the witness Welch further states, when asked whether the timber on the land referred to in the plaintiff's bill will have a special value to the plaintiff or its successors or assigns, says that, "at the present time he can not think the timber

on the tract in question can be turned to any valuable account; that, after the timber is exhausted from the land in coal, it may then be valuable for mine ties and props."

In view of this testimony, which is uncontradicted, it is difficult to perceive how the plaintiff could suffer irreparable damage by failing to get it. Even if there was no mistake in the parties, in entering into the contract, would it be in accordance with the rules of equity, under the circumstances surrounding this case, where a mutual mistake has led the parties to contract in regard to a subject which has no existence, to specifically enforce the contract as to another subject, which never would have found any place in such contract, had it not been regarded as an ancillary concomitant to the remaining portion of the agreement with reference to mining and removing the coal? We can conceive of nothing more inequitable than the enforcement, specifically, of a contract for timber, originating as this one did, and so closely allied with a contract for the coal which was supposed to lie beneath it that it might well be regarded as forming an entire contract, which should not be enforced by piecemeal in a court of equity.

The general principles governing cases of this character are laid down in 15 Amer. & Eng. Enc. Law, p. 628, as follows: "In order that a mistake may come within the cognizance of a court of equity, it must be shown to be—First, material, or the moving cause of the complaining party's action; second, mutual, or shared in by both parties to the transaction; third, unintentional; and, fourth, free from negligence." It would be difficult to use language which would more accurately describe the mutual mistake which was made by the contracting parties with reference to the coal supposed to underlie this land, which acted as the moving cause and inducement to the contract for the timber. In the absence of the coal, the evidence shows there would have been no contract for the timber. This was the foundation on which the timber contract rested, and, the foundation having no real existence, the superstructure must fall.

Kerr on Fraud & Mistake, at page 405, says: "The

jurisdiction of equity over mistake is exercised much more liberally where the mistake is in matter of fact than where it is in matter of law. The admission of ignorance of fact as a ground of relief is not attended with those inconveniencies which seem to be the reason for rejecting ignorance of law as a valid excuse," *etc.* And again, in a note on page 416, we find the following: "Nothing is more clear than the doctrine that a contract founded in a mutual mistake of the facts constituting the very basis or essence of it will avoid it." See *Trick* v. *Fultons' Ex'r*, 3 Gratt. 193.

But if this agreement was not entered into by reason of mutual mistake, but was induced by representations made by the parties with whom he contracted in regard to the construction of a railroad up the Bluestone within a short period and as to the vein's of coal underlying said Bell's land, if these representations had no foundation in fact and induced the contract in reference to the timber and coal, if these representations are to be considered as material, and it is shown that they were relied on by said Bell, it is ground for a rescission of the contract in equity.

This doctrine is found in the case of *Iron Co.* v. *Trout*, 83 Va. 397 (2 S. E. Rep. 713, first point of syllabus) were "false representations of material facts constituting inducement to contract, and on which a party has a right to rely, is ground for rescission in a court of equity. Matter of opinion may amount to affirmation, and be inducement to contract, and will be ground for rescission, especially where parties deal not on equal terms. An affirmant has, or is presumed to have, means of information not equally open to the other party." See, also, *Linhart* v. *Foreman's Adm'r* 77 Va. 540, first points of syllabus where it is held that "a false representation of a material fact constituting an inducement to the contract, on which the purchaser had a right to rely, is ground for the rescission of the contract by a court of equity, although the party making the misrepresentation was ignorant as to whether it was true or false; and the real inquiry is not whether the vendor knew the representation to be false, but whether the purchaser believed it to be true, and was misled by it into the contract. In such case, whether the false representation was inno-

cently or willfully made, the effect is the same on the purchaser." See, also, *Lowe* v. *Trundle*, 78 Va. 65; 2 Pom. Eq. Jur. § 868.

The next question I shall consider is whether the party seeking relief from the court, and those under whom it claims by assignment, have shown that diligence which would entitle them to relief in a court of equity, even if the contract was not the result of mutual mistake or of misrepresentation either wilfully or innocently made, upon which the defendant acted.

In making this agreement to lease the coal mentioned therein, and to let the lessor have the timber to aid in its safe and economic mining, it is presumed that said David Bell expected to receive some returns in the shape of royalty during his natural lifetime; and, although the agreement provides that the lease is to continue for ninety years, the law contemplates that operations shall be commenced in a reasonable time, in order that the lessor may enjoy his royalty, and the lessee the coal; otherwise the presumption arises that the lessee has abandoned his rights thereunder.

In this case, it was evidently contemplated that the timber should be used about the mining operations. It was not, however, intended that the mining operations could postponed for seventy, eighty, or ninety years, until prices and circumstances changed—until it was ascertained that no coal existed under the land—and still allow the lessor to claim the timber at a nominal price. But, if operations were not commenced in a reasonable time, the defendant Bell had the right to treat the whole contract as abandoned.

In the case of *Iron Co.* v. *Trout*, 83 Va. 409 (2 S. E. Rep. 713) the court in speaking of this subject says: "The lease was for a term of twenty years. Yet, looking to its nature and object, it can not be contended that the lessees had the option to work or not to work the ore mines for an indefinite time, and thus convert what was designed to yield a handsome daily income to the lessors into a mere barren incumbrance on his land—a cloud on his title—an incubus and a manacle, which would oppress him, and destroy the marketable value of his land.

No lease of land for a rent for a return to the landlord out of the land which passes can be construed to be intended to enable the tenant merely to hold the lease for the purposes of speculation, without doing and performing in connection therewith what the lease contemplated. Such a construction would, indeed, make all such contracts a snare for the entrapment and injury of the unwary landlord." * * "A man buying and paying for land may do with it as he likes, but a tenant to whom land passes for a specific purpose has no discretion. He must perform what he has stipulated to do, and if he has obtained the lease by misrepresentation and fraud the lessor may have it rescinded in equity."

In the case of *Cowan* v. *Iron Co.*, 83 Va. 547 (3 S. E. Rep. 120) it appears that an agreement was made in June, 1880, between said Cowan and said Radford Iron Company for the sale of all the ores, minerals *etc.*, underlying a certain tract of land owned by said Cowan. Said company had the right to enter at any time from and after the date of the contract with workmen *etc.*, to mine and remove the ore. In the summer and fall of 1880, the said company, in pursuance of its provisions, entered upon the said land, and removed a small quantity of ore—some two hundred tons—and paid to said Cowan fifteen cents per ton therefor, and after that did nothing further; and in January, 1884, a bill was filed by Cowan to have a rescission of said contract. The Circuit Court dismissed the plaintiff's bill. An appeal was taken, and the Court of Appeals of Virginia held that, "if one party may terminate an estate at his will, so may the other. Right to terminate is mutual;" also, that "where the minerals in certain lands are sold, with the usual mining rights to begin at any time after date of the agreement, with no time fixed for their ending, while the compensation is to be paid quarterly, as the iron ore is mined, but lessee to have the privilege of removing from the land at any time and machinery, *etc.*, erected by him, and lessee has abandoned, and failed to mine and pay anything quarterly, he must be held to have terminated the estate, as he had the right to do, and lessor is no more and no further bound thereby."

Barton, in his Chancery Practice (volume 1, p. 121) states the doctrine thus: "Owing to the general rule that the specific performance of a contract will not be enforced, in a court of equity, unless the party seeking it has not been in default, but, on the other hand, has shown himself to have been ready, eager, prompt and desirous of maintaining his rights, the rule of *laches* is more strictly applied in cases of this character than in ordinary suits for accounts, *etc.*, and hence, though in some instances a long delay has been held insufficient to bar the complainant's rights, yet in others a very short time has been sufficient for that purpose."

In this case, the party who was to mine and remove the ore had only failed to do so for about four years, while in the case under consideration the lessees had waited for seventeen years without mining a lump of coal. The Bluestone Coal Company, some thirteen years after the contract was made, authorized the railroad company to take some timber off of the defendant Bell's land for cribbing for trestles, and Mr. Welch was directed by the president of the Bluestone Coal Company to pay said David Bell for said timber, but he refused to accept it in payment for timber used by the railway company, so that no timber was ever taken from the said land; and the testimony shows that there is very little merchantable timber on said land.

But, be that as it may, under the decision above quoted, and under the circumstances shown by the testimony, the defendant Bell had a right to regard said contract as abandoned; and it being manifest that there was a mutual mistake in the contracting parties as to the character of the coal in said lands, the court erred in perpetuating said injunction, and refusing to dismiss the plaintiff's bill, and in refusing to rescind said contract and dissolve said injunction.

The decree complained of is therefore reversed and annulled, and such decree entered here as the Circuit Court should have rendered, with costs.