ELK FORK OIL & GAS CO. et al. v. JENNINGS et al. JENNINGS et al. v. ELK FORK OIL & GAS CO. et al. FOSTER v. SAME.

(Circuit Court, D. West Virginia. January 25, 1898.)

1. QUIETING TITLE—EQUITY JURISDICTION—OIL AND GAS LEASES.
   One in possession of lands under oil and gas leases may maintain a suit to quiet title against others claiming possession under other leases.

2. EQUITY JURISDICTION—DISPOSING OF WHOLE CASE.
   When a court of equity has obtained jurisdiction of a controversy, in order to make effective such jurisdiction, and to give due force to its decrees, it will proceed to dispose of all questions properly presented by the pleadings, and fairly pertaining to the full and equitable disposition of the cause.

3. OIL AND GAS LEASES—CONSTRUCTION—WAIVER OF FORFEITURE BY LESSOR.
   A stipulation in a lease of oil and gas lands to the effect that the lessee shall, within a given time, complete one well, "unavoidable accident" excepted, on pain of forfeiture, or else pay the lessors a certain amount per acre per annum after the time for completing such well shall have passed, will be deemed to have been waived by a recognition by the lessors of the unavoidable character of accidents by which such completion is prevented, coupled with assent to and acquiescence in such delay.

4. SAME—ABANDONMENT OF RIGHTS BY LESSEE.
   By numerous leases, in substantially the same terms, obtained from different parties, a lessee acquired the exclusive right in a large territory "of drilling and operating for petroleum oil, and gas." He stipulated to give the lessors a certain proportion of the oil obtained, and pay them a fixed sum annually for each paying gas well; and he was required, on pain of forfeiture, to complete one test well within the territory in one year from the dates of the leases. Held, that he did not, immediately on the performance of this latter condition, become vested with an absolute right for 10 years to the oil and gas privileges in the whole territory, but was bound, within a reasonable time thereafter, to search for these minerals on the premises described in each lease, and a failure to do so as to some of the leases was an abandonment thereof.

5. SAME—"LEASE SUBJECT TO PRIOR LEASE."
   Where, in a subsequent lease of such abandoned property, a clause is inserted to the effect that it is to be held subject to the original lease, such clause is to be construed as meaning that the lessors intended to incorporate into their contract the fact that they had advised their lessee that the land had been theretofore leased, and that he was to take it subject to the old lease, with the understanding that if the latter was valid he should take nothing by the contract, but that if it was invalid the conveyance should then stand as a contract binding upon the parties.

T. P. Jacobs, David Sterrett, R. S. Gregory, and W. P. Hubbard, for Elk Fork Oil & Gas. Co.

George C. Sturgiss and Caldwell & Caldwell, for E. H. Jennings and others.

B. M. Ambler, A. Leo. Weil, and C. M. Thorp, for George E. Foster.

Before GOFF, Circuit Judge, and JACKSON, District Judge.

GOFF, Circuit Judge. The Elk Fork Oil & Gas Company, and certain parties in interest with that company, on the 19th day of March, 1897, filed a bill in equity in the circuit court of Tyler county, W. Va., against E. H. Jennings, James M. Guffey, R. H. Glatzau, and others, in which suit on said day an injunction was issued restraining said defendants from taking possession of 1,077 acres of land situate in said county, claimed by the complainants in said cause for oil and gas purposes, under and by virtue of certain leases thereon made by the owners of said land. Such suit was, by due proceedings had, removed into this court. The complainants, on April 2, 1897, filed in this court an amended bill against the same defendants, and also against George E. Foster and others. On the 14th day of April, 1897, the complainants filed an amended and supplemental bill. On the 6th day of April, 1897, George E. Foster (who was named as a defendant in said amended bill, but who was not served with process until April 8, 1897, filed his bill against the Elk Fork Oil & Gas Company and others, and obtained from this court a restraining order against the complainants in said original and amended bill. It appears from the record that Foster, when he filed his bill, was aware of the fact that the questions raised by the same concerning what is known as the Hawkins lease of September 4, 1889, had been presented to the court by the amended bill filed on the 2d day of April, 1897. When the amended and supplemental bill was filed on April 14, 1897, the Elk Fork Oil & Gas Company moved for an injunction against Foster, as prayed for in said bill, and also moved to dissolve the restraining order which had been awarded to Foster on the 6th day of April, 1897. The court, after hearing counsel on said motions, and duly considering the questions raised by the pleadings, ordered that the two suits should be heard together, and also that the bill filed by Foster should be treated as a cross bill in the suit brought by the original complainants. The court also at the same time appointed Charles W. Brockunier receiver, with instructions to drill wells on the 50 acres of land in controversy between Foster and the Elk Fork Oil & Gas Company, at such places and in such manner as he might deem best and proper, provided that the funds required for that purpose should be advanced by the parties in interest, with the understanding that the same should be returned from the production of the territory, should the same be sufficient; otherwise the party making such advances to lose the same. All parties to the controversy were enjoined from interfering with the receiver in the exercise of the rights conferred upon him by the order of the court. On the 17th day of April, 1897, the defendants Jennings, Guffey, and Glatzau filed their answer, and at the same time tendered their cross bill, which was duly filed. On the filing of their answer and cross bill the court appointed W. A. McCosh

receiver, so far as the oil and gas rights were concerned in the 100 acres of land claimed by the Elk Fork Oil & Gas Company known as the "Wood Lease," and also so far as the Tuttle lease was concerned, claimed by the same parties, the purpose and duties of such receiver being virtually the same as those theretofore given Receiver Brockunier. On April 30, 1897, the Elk Fork Oil & Gas Company filed their answer to said cross bill, and moved the court to discharge the receiver; the defendant Foster at the same time demurring to complainants' bill. On the 10th day of May, 1897, Foster filed an amended bill against the original complainants and certain others, lessors of part of the lands in controversy, and asked for and obtained from the court an order extending the powers of Receiver Brockunier over the land owned by Joshua Hawkins, T. G. Hawkins, Eli Wetzel, David Summers. and James Eddy. On the 19th day of June, 1897, the defendant Foster filed his answer to the complainants' bill.

The complainants in their amended bill alleged that one L. B. Hill, during the months of December, 1896, and January, 1897, leased from certain persons in Tyler county, W. Va., for oil and gas purposes, certain tracts of land, making in the aggregate 1,077 acres; that soon thereafter, under said leases, the complainants took possession of said lands, located a well on the 100-acre track leased by Warren and James Wood, and drilled the same to completion, in pursuance of the terms of said lease; that about the 16th of March, 1897, the complainants heard that the defendants Jennings, Guffey, and Glatzau claimed the right to drill on the land covered by the lease from Warren and James Wood; that they had contracted for the erection of a derrick thereon, and were endeavoring to oust the complainants from the possession of the same; that they (the complainants) then secured the restraining order in the proceedings instituted in the circuit court of Tyler county; that about that time said defendants served notice on the complainants forbidding them to operate for oil on the Wood land, and claiming title to the oil and gas rights thereof, under a lease made to one William Johnston in September, 1889, by Lyman Wood, the father of Warren and James Wood. It was also alleged by complainants that on September 4, 1889, Lyman Wood made an oil and gas lease on 200 acres of land then owned by him, of which the 100 acres leased to complainants by Warren and James Wood is a part, to William Johnston; that on November 14, 1889, the said William Johnston assigned to C. G. Dickson, D. C. Gruntz, and Julius McCormick thirteen-eighteenths of his holdings in a certain block of leases (which included the lease of Lyman Wood to him), and that on March 19, 1897, Johnston, McCormick, Gruntz, and Dickson's executors assigned said leases to one John Stealey, who on the same day assigned a one-third interest in the same to one L. E. Smith, and that on March 20, 1897, Stealey and Smith assigned to George E. Foster an interest in the said leases, which also included certain leases made by Eliza and B. F. Hawkins and James Eddy to the said Johnston in the year 1889, the lands covered by the same being a part of the 1,077 acres claimed by the complainants under the leases executed to L. B. Hill, before

mentioned. Complainants also averred that the defendants had no rights under any of the leases so made to William Johnston in 1889, because the same were, each and all of them, void, and that, therefore, all such rights as had theretofore existed under them had long before become forfeited; that Johnston, and those claiming under him, had made default in the stipulation contained therein to complete a well within one year from the date of said leases, respectively, in Ellsworth, Meade, Lincoln, or Union districts, unavoidable accidents excepted; that neither Johnston, nor any one claiming under him, had ever drilled a well upon any of the lands covered by the complainants' leases, and that no development in fact had been made under any of the leases so given to Johnston; that certain parties, claiming under other and subsequent leases from the owners of the land, had drilled two wells within Ellsworth district, but, finding no oil, they had dismantled their rig, and had abandoned all of the territory so tested and leased to Johnston; that neither Johnston nor any one else ever paid to Lyman Wood the sum of 10 cents per acre per annum on account of the payment provided for in the leases made by him to Johnston, nor was any sum paid to any of the lessors of the other leases, nor was any such amount ever tendered until after oil was produced on the Wood land by complainants, when the defendant Johnston tendered to Warren Wood, James Wood, and other lessors of Johnston certain sums of money alleged to represent the payments provided for in the leases to him, which tender complainants allege was an admission on the part of Johnston of his failure to comply with his contract requiring the drilling of a well within one year from the date of the leases; that Warren Wood, James Wood, and the other lessors to Johnston, being well aware of his failure to drill a well as required, and to make the payments provided for, as also of his abandonment of the property described therein, had repeatedly declared the forfeiture of said leases; that the leasing of the land by Warren and James Wood to Hill was such a declaration of forfeiture, and that the refusal of the lessors to accept the tender of 10 cents per acre, before mentioned, was also such a declaration, and that Johnston and those claiming under him had years before recognized such forfeiture by refusing to proceed with the drilling of wells, unless the owners of the different tracts of lands would grant new leases on the same, which in a number of instances had been done for the purpose of securing development; that the said Johnston, in the fall of 1889, obtained many leases in Tyler county, aggregating thousands of acres, which were all of the same character as the one made by Lyman Wood, and that all of them have been abandoned and forfeited on account of the facts before mentioned; that the land leased to Johnston by Lyman Wood is now owned by Warren and James Wood, his sons, and that when they leased the same to Hill they regarded the lease made by their father to Johnston as null and void, but still, in order to protect themselves from any liability or expense of litigation, in case the Johnston lease should thereafter be asserted against them, they caused the words, "This lease is taken subject to the William Johnston lease. September, 1889," to be inserted in the lease made by them to Hill.

In their supplemental bill the complainants alleged that the lease made in September, 1889, by Eliza Hawkins and Benjamin Hawkins to William Johnston had become forfeited and void; that George E. Foster, claiming under the same, and asserting the right to drill for oil upon the 100 acres of land leased by said parties to Hill, had undertaken to occupy the ground covered by that lease and to oust the complainants therefrom; that he had on April 7, 1897, caused a notice to be served upon the complainants requiring them to desist from their operations on that tract of land; that the complainants had taken possession under the Hawkins lease to Hill, had located a well thereon, and were about to drill the same, and that said land was separated from the Wood tract of land, on which they had a producing well, only by a tract of 9 acres, said producing well being only 600 feet from the well located on the Hawkins land.

In the cross bill filed by Foster the execution of the lease by Eliza and Benjamin Hawkins to William Johnston on September 4, 1889, is alleged, and also that Johnston at the same time took a large number of similar leases in the same territory, which was then undeveloped for oil or gas, and that consequently the lessors in said leases were most eager to have a test well in that section, and that the procuring of such a well was one of the considerations moving the lessors to make such leases; also that Johnston procured to be drilled, in accordance with the terms of the Hawkins lease, an oil well upon one of the tracts leased to him; that the drilling of said well was attended with much difficulty, because of its great distance from the point of supply of material, and also because the character of the territory and the strata to be drilled through had been theretofore unknown; that the well was begun in April, 1890, and the work prosecuted continuously until the drill had reached a depth of 1,200 feet, when the tools became fastened; that the drillers tried, but failed, to extricate them, and that the work was finally abandoned, and the rig moved about 20 feet, where another well was started, which was prosecuted continuously to completion; that such well was drilled to the "Big Injun" sand, which was the usual oil-bearing sand in the Tyler county territory, and that, as no oil was found, the drill was run still deeper, through the "Gordon" sand, in all to the depth of 2,700 feet, but that no oil was found, and the hole was dry; that the "Big Injun" sand was reached in October, 1890, and the well completed, as mentioned, in December of that year; that the drilling was attended by numerous accidents, and that the well caved, and caused many delays, and that the fastening of the tools and the caving of the well were "unavoidable accidents," whereby at least five months of delay was caused, and that the well cost over $11,000; that the drilling of said well complied with the requirements contained in the Hawkins lease to Johnston, and that, but for the delays mentioned, it would have been completed within a year after the date of said lease; that all the lessors, including Hawkins, were greatly interested in the well, and were anxious to see it completed, and that they conceded that the failure to complete the same within a year was due to "unavoidable accidents," and therefore none of them demanded rental, or claimed the right to declare a forfeiture;

that in fact the well was drilled in accordance with the terms of the lease to Johnston; that in all respects said terms were complied with, and that there was no forfeiture of any of his leases; that Johnston, who was the pioneer contractor in said territory, was at great expense in taking the large number of leases secured by him in Tyler county during the years 1889 and 1890, and that he either drilled or caused to be drilled a large number of wells on various of said leases situated in said districts of Lincoln, Ellsworth, Union, and Meade, at a cost of over $100,000; that said wells were drilled during the years of 1890, 1892, 1893, 1894, and 1895.

The defendants Jennings, Guffey, and Glatzau in their answer admit the making of the leases by the different lessors to Hill, as alleged by the complainants, and claim that the same are void, and subordinate to the leases given for the same land, in 1889, to Johnston. They deny that they or Johnston ever abandoned any of said leases, and especially any portion of the Lyman Wood land. They assert that they had no notice of the lease made by Warren and James Wood to Hill, or of Hill's assignments of the same, until March 19, 1897, when they notified the complainants that they were the lawful owners of the Lyman Wood lease, and that they were entitled to all of the oil and gas under that land; that the complainants drilled their well on said land in bad faith, and with full knowledge of the exclusive right of the defendants, or of Johnston and his assigns, to operate upon the same; and that they have been the equitable owners of the leases claimed by them ever since August, 1892, and the legal owners of the same since March 23, 1897. Other matters are set out in the answer of Jennings, Guffey, and Glatzau, and also alleged in the cross bill filed by them, of similar import to the claims made by Foster in the cross bill filed by him, setting forth the execution of the leases to Johnston in 1889, the work done by him and his assigns in connection with the same, the assignment of said leases and their subsequent transfer to others, and also showing the present claimants of the same; also asserting that said leases have not been forfeited, and declaring their validity at the time of the institution of these proceedings. We do not deem it necessary to repeat them in detail. The answer of the Elk Fork Oil & Gas Company to the cross bill filed by Jennings, Guffey, and others reiterates the averments of the amended bill, and sets up some additional matters, which will be alluded to only as they are drawn in question in the disposition of the matters in controversy. The allegations and claims found in the amended bill filed by Foster, and in the answer tendered by him to the amended bill of the Elk Fork Oil & Gas Company, will be likewise referred to and disposed of.

It is claimed by the defendants Jennings, Guffey, Glatzau, Foster, and others that a court of equity is without jurisdiction to grant the relief sought by the Elk Fork Oil & Gas Company in the proceedings instituted by it. The complainants allege that they are in the actual possession and occupancy of the land covered by the leases made to Hill, and that their title to the same is good, but that the Johnston leases under which the defendants claim, although forfeited and abandoned, operate as a cloud on their title, which should be removed

by a decree of a court of equity. If the Elk Fork Oil & Gas Company have title to the leases on the 1,077 acres of land as claimed in the amended bill, then the leases under which Jennings, Guffey, Glatzau, and Foster claim are evidently void, and cloud the title of that company to its property. The complainants' title depends upon the validity or invalidity of the Johnston leases, and so we have those claiming under the leases to L. B. Hill, who are in possession, contending against those who claim under the Johnston leases, who are out of possession, and who not only claim the right, but ask the court to decree them permission to enter. That equity has jurisdiction of the suit of one in possession of real estate to remove a cloud from his title is, we think, without doubt,—is too well established to be seriously questioned. Clayton v. Barr, 34 W. Va. 290, 12 S. E. 704; Moore v. McNutt, 41 W. Va. 695, 24 S. E. 682; Hoopes v. Devaughn (W. Va.) 27 S. E. 251; Crawford v. Ritchey (W. Va.) 27 S. E. 220; Harding v. Guice, 42 U. S. App. 411, 25 C. C. A. 352, 80 Fed 162; McConihay v. Wright, 121 U. S. 201, 7 Sup. Ct. 940.

The demurrer filed by Foster is not well founded, and is therefore overruled. As we have, because of a distinct ground of equity jurisdiction, held that this court has jurisdiction of this controversy, it follows that, in order to make effective such jurisdiction, and to give due force to its decrees, the court must dispose of all questions properly presented by the pleadings, and fairly pertaining to the full and equitable disposition of the cause.

Having thus disposed of the questions relating to the jurisdiction of the court, we come now to consider the real matters at issue between the parties to these controversies. The leases under which the defendants claim were all taken by Johnston in the year 1889, their terms practically the same, and they are, in substance, as follows:

"The said party of the first part, for the consideration of the covenants and agreements hereinafter mentioned, has granted, demised, and let unto the party of the second part, his heirs or assigns, for the purpose and with the exclusive right of drilling and operating for petroleum oil and gas, all that certain tract of land situate, * * *. The party of the second part, his heirs or assigns, to have and to hold the said premises, for the said purposes only, for and during the term of ten (10) years from the date hereof, and as much longer as oil or gas is found in paying quantities. The said party of the second part, in consideration of the said grant and demise, agree to give to the party of the first part the full and equal one-eighth part of all the petroleum oil obtained or produced on the premises herein leased, and to deliver the same in tanks or pipe lines, to the credit of the party of the first part. It is further agreed that, if gas is obtained in sufficient quantities to utilize, the consideration in full to the party of the first part shall be one hundred dollars per annum for each and every gas well drilled on the premises herein described, if of sufficient pressure to guaranty the laying of a pipe line to convey it to market, payable in ninety (90) days after the line is laid. The party of the first part grants the further privilege to the party of the second part of using sufficient water from the premises herein leased necessary to the operation thereon, the right of way over and across said premises to the place of operating, together with the exclusive right to lay pipes to convey oil and gas from this as well as adjoining farms, and the right to remove any machinery or fixtures placed on said premises by second party. The second party hereby agree to pay any damage done to growing crops by the laying of pipes. One well to be completed within one year in Ellsworth, Meade, Lincoln, or Union districts from the date hereof, unavoidable accident excepted; and, in case of failure

to complete operations on a well within such time, the party of the second part agree to pay to the party of the first part for such delay the sum of ten cents per acre per annum after the time for completing such well as above specified, payable by deposit at the ———, or directly to the party of the first part; and the party of the first part agree to accept such sum as full consideration and payment for such yearly delay, until one well shall be completed; and a failure to complete one well, or to make such payment within such time as above mentioned, renders this lease null and void, and to remain without effect between the parties hereto. Ten (10) acres surrounding the building· are hereby reserved, to be operated by second party only, if said first party decides to have it drilled. Operations to be conducted so as to interfere the least with farming privileges. The party of the first part may have gas for domestic use, if there is sufficient, after supplying the boilers on the premises. It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors, and assigns."

The defendants who claim title under the Johnston leases insist— First, that Johnston and his assigns, by virtue of said leases, secured the right to drill and operate for petroleum oil and gas, on the lands described in the leases, for the period of 10 years from their respective dates, and as much longer as oil or gas should be found in paying quantities, subject to an earlier termination by forfeiture, in case of failure to complete one well in one of the four districts named within one year from date of said leases, unavoidable accident excepted, and subject, also, to forfeiture if the said lessee, failing to complete operations on a well in such time, should also fail to pay to the lessor for delay the sum of 10 cents per acre per annum after the time for completing such well had expired; second, that there has been no forfeiture or cause for forfeiture, because such well was completed in the specified time, and also because that, even if the well was not so completed, it was in fact completed before a yearly sum fell due as rental, and that, therefore, there was no such default in payment as gave cause for forfeiture; third, that the title of the lessee, when once perfected by the fulfillment of his covenant to drill a test well, became vested and fixed for the term of 10 years, and as much longer as oil or gas should be found in paying quantities, and that thereafter the lessee was under no obligation to operate further, until developments in the vicinity of said leases necessitated operations, and gave rise to the implied covenants of the lessee to protect the property from damage, and to take out the oil when found within a reasonable time, and that meanwhile there could be no abandonment of said leases unless there was an actual intention to do so, and that nonaction would not constitute abandonment; fourth, that under the evidence in this case there was in fact no abandonment.

The contention of the Elk Fork Oil & Gas Company is that the leases to Johnston granted no interest in the oil or gas in the premises leased, but simply ·the right to search for them, and that only when such search had been made, and oil or gas actually found, did the leases operate to grant to the lessees any interest in such substances so searched for and found; that such leases not only conferred the right to search, but that they also imposed on the lessee the duty to do so within a reasonable time, and that, if he did not do so, his rights must be considered as at an end, because abandoned by

him; that, if no oil or gas was found, the rights of the lessee ceased when the search was finished and the explorations abandoned.

On one point the parties to this controversy seem to be in accord, and the court is able to agree with them, and that is if Johnston or his assigns failed to complete one well in either Ellsworth, Meade, Lincoln, or Union districts of Tyler county within one year from the date of each of said leases, "unavoidable accident" excepted, and if they, in case of failure to complete operations on a well in such time, failed to pay to the several lessors the sum of 10 cents per acre per annum, after the time for completing such well had expired, that the lease, at the option of the lessor, became forfeited and void. So far as the question of forfeiture is concerned, we are impelled to the conclusion, after giving due weight to all the testimony relating thereto, that the test well on the Smith farm was completed within the period provided for in the leases; and also, so far as this point is concerned, we hold that it is immaterial whether we regard the well as completed when the "Big Injun" sand was drilled through, or at the time when the drill had passed through the "Gordon" sand. It is quite evident that all of Johnston's lessors were watching the Smith well with interest as well as anxiety, and that they also regarded the delay occasioned by the caving of the well, the fastening of the tools, the moving of the rig, and the injury of the employés to be of the character of accidents mentioned in the leases as unavoidable; and while we think that, after making due allowance for the time so consumed by such "unavoidable accidents," the well was completed within the time stipulated for, still, so far as these controversies are concerned, that point is not essential, for the reason that the lessors not only assented to the delay, but were anxious that the work be continued, and after the well was completed they, by their conduct and acquiescence, clearly made it appear that they did not regard the time consumed in drilling said well as ground for forfeiture. The lessors, down to the time of the completion of the Smith well, acted as if they believed that Johnston and his assigns had proceeded to develop his territory in good faith, and they neither made complaint, demanded rental, nor declared a forfeiture.

Finding these facts to be as we have indicated, it follows that, at the time of the completion of the Smith well, there was no forfeiture of the Johnston leases because of failure on his part or on the part of his assigns to comply with the terms of the same. This brings us to the further consideration of the leases, and of the duty of Johnston, and those holding under him, to the respective lessors, so far as the search for oil and gas and the development of the several separate tracts of land are concerned.

The drilling and completion of the test well within the period provided for, renders it unnecessary for us to determine what would have been the situation between the parties if the well had not in fact been drilled, and if Johnston had paid to the lessors the rental stipulated for in case of delay. That condition of affairs does not exist, the argument relating thereto was unnecessary, and the court will not further consider the provisions of the leases relating to the same.

The only remaining question is, were the Johnston leases covering the land now claimed by the Elk Fork Oil & Gas Company (under the leases made to Hill) abandoned by Johnston or his assigns, after the completion of the Smith well? Is the claim of the defendants that by virtue of the completion of the test well their title to the leases became vested for the granted term of 10 years, and as much longer as oil or gas should be found in paying quantities, without obligation on their part to operate further, well founded? We think not. We think that the parties to the contracts, when they stipulated that the lessors were to have the full equal one-eighth part of all the petroleum oil obtained or produced on the premises leased by them, and an annual compensation for the gas utilized, intended that such royalty should be paid, and the necessary search made, within a reasonable time after the execution of the leases, and that the lessee was to have the period of 10 years in which to remove the oil and gas from the land, with the understanding that, if at the expiration of that time such products should still be found in paying quantities, the term should be extended until they were removed. The oil or gas referred to was expected ·to be "found" on the particular land described in each of the several leases, and not on some unknown and unmentioned tract within one of the four districts in Tyler county referred to in each lease. It is set forth in the contract that the grant is made "for the purpose of drilling and operating for petroleum oil and gas," and it is distinctly stated that the premises are to be held "for the said purposes only." The only delay contracted for by Johnston was for one year after the date of the several leases, or during the time required for the drilling of the test well. After that period had elapsed it was the duty of Johnston, or of those claiming under him, to search for oil or gas, with reasonable diligence, on each tract of land leased by him. We must determine from the evidence whether or not such search was made. We find, as a matter of fact, that after the execution of the leases to Johnston in 1889, and down to the institution of the original suit by the Elk Fork Oil & Gas Company, in March, 1897, that neither Johnston, nor any of his assigns, ever entered upon any of the several tracts of land so leased to him, and now claimed by the complainants, for the purpose of searching for oil or gas. It is true that Johnston, and those representing him, did take possession of and bore for oil and gas upon many of the tracts of land leased to him in said four districts, as well as in other portions of Tyler county, and that he also expended large sums of money in the development of that section, for which he is entitled to, and we doubt not has received, the commendation of the people living therein. As to the leases on which he so operated we have nothing to do, as we are not now asked to pass upon his title thereto. It is only concerning the leases now claimed by the Elk Fork Oil & Gas Company, as to which neither Johnston, nor any one claiming under him, has ever made any search or development of any character, that we can in these proceedings pass judgment upon. The fact that Johnston, acting for himself or through others, drilled a large number of wells in the four districts of Tyler county mentioned in the leases, may show that he was en-

ergetic in his efforts to test the theories he had formed as to the location of the oil belt in that section, but it does not relieve him of the duty he owed to the lessors of the leases covering land on which he had made no search. We agree with counsel for the defendants that the testimony shows that the lessors of the leases under which the Elk Fork Oil & Gas Company claim regarded the leases given by them to William Johnston, in 1889, for the same land, as still binding upon them at the time of the completion of the well upon the Smith farm, but we are compelled to differ with said counsel in their estimate of the testimony bearing on this point, relative to the period between that date and the institution of this suit. It is quite evident that Johnston himself regarded these particular leases with distrust, at least during the years 1894, 1895, and in the early part of 1896. He not only failed to drill upon them himself, but he endeavored to secure new leases, before he would authorize others to commence operations. The lessors themselves always desired development, and they were willing at all times to renew the old or execute new leases, if thereby that desirable result could be brought about; but it is, we think, a misconception of their conduct to claim that it was an admission on their part of the validity of the leases. When we recall the declaration and conduct of Johnston and McGuire during their visit to the vicinity where the lessors resided, in June, 1895, at which time there was an effort made to secure a renewal of these leases, or of at least a part of them, it is not at all surprising that the owners of the land abandoned hope of securing development under the leases given in 1889, and sought the same in other directions. The leases given in April, 1896, to L. C. Sands, called the "Paova Leases," which covered the territory in controversy, and which were subsequently returned to the lessors, show plainly that they at that date considered that Johnston had abandoned the leases taken by him in 1889. These leases were made some time after Johnston had failed in his endeavor to secure new leases, and the lessors therein, who were also the lessors in the Johnston leases, by executing said Paova leases, in effect declared that the leases made to Johnston in 1889 had been abandoned by him, or by those who had claimed under him. The fact that all of the Paova leases contained the following clause, "subject to the Johnston lease." must be considered in connection with the circumstances surrounding the parties when they executed the same. In our judgment, the lessors intended by these words to incorporate into their contracts the fact that they had advised their lessee that the land had been theretofore leased to Johnston, and that he was to take it subject to the old lease, with the understanding that if the Johnston lease was valid he took nothing by the new grant, but that if it was invalid the conveyance was then to stand as a contract between the parties. To hold, as insisted upon by counsel for defendants, that said words were intended as an admission of the validity of the Johnston leases, would be to hold that the parties to the new leases admitted by them that the lessor had nothing to grant, and that consequently there was nothing for the lessee to take. Clearly does it appear that such was neither the belief nor the intention of the par-

84 F.—54

ties. Under similar circumstances, learned counsel would doubtless have employed other and more apt language, but still we think the words used are sufficient to enable the court to read the contract as we have construed it, and thereby get not only near to, but exactly at, the intention of the parties. With the conclusion reached by the lessors that Johnston had abandoned the leases we fully concur, and we further find from the evidence that as to these particular leases it was his intention to do so. Both public and private interests require that such facts as are disclosed by the testimony in these cases should be held by a court of equity to constitute abandonment of the leases involved, because of nondevelopment. It should be kept in mind that Johnston in all these leases was the party who was to take the initiative. He was the actor who was to commence development and make the search on all the land described in them. This he, for reasons of his own, so far as these particular leases were concerned, failed to do, from 1889 to 1897. He now asks a court of equity, after such unreasonable delay on his part, and gross neglect of his implied duty, and after there has been a material change in the situation, brought about by the efforts of others in interest, to decree that he is entitled to the possession of the property he had abandoned. To so decree would not only be unconscionable, but it would retard the development of the country, and at the same time it would reward those who have been negligent, and punish those who have been prompt, in the discharge of their contract duties.

After Johnston caused the Smith well to be drilled it was his privilege to determine—using for that purpose the information secured by that well—in what direction and on what particular tracts of land he would make his subsequent developments, and if, in so doing, his conduct and his declarations resulted in the abandonment of the leases located in other sections, for any misfortune to him occasioned thereby he must hold his own judgment responsible, and not the judgment of this court. It was evidently not the intention of Johnston, when the numerous leases were executed to him in 1889, amounting in the aggregate to over 20,000 acres, to drill wells upon each and every separate tract; but he intended, using each separate search as an indicator, to locate, if possible, the points where oil and gas could be found, and, having done that, to abandon those leases that previous development had shown to be located in unprofitable localities. That he, and those operating under him, regarded the leases in the Elk Fork region of Tyler county as worthless, in an oil-producing sense, is, we think, fully shown by the testimony, and such conclusion on his and their part is but another illustration of the uncertainty and surprises that come to those engaged in the development of oil territory.

The construction that we have placed upon the words used in the Paova leases—"subject to the Johnston lease"—also disposes of the question and the argument concerning the words, "subject to the William Johnston lease of September, 1889," found in the lease given by James and Warren Wood to L. B. Hill.

We cite the following authorities bearing upon the questions raised in connection with the construction, forfeiture, and abandonment of

the leases we have had under consideration, and as sustaining the conclusion we have reached: Guffey v. Hukill, 34 W. Va. 49, 11 S. E. 754; Mullan's Adm'r v. Carper, 37 W. Va. 215, 16 S. E. 527; Coal Co. v. Bell, 38 W. Va. 297, 18 S. E. 493; Bettman v. Harness, 42 W. Va. 433, 26 S. E. 271; Crawford v. Ritchey, 27 S. E. 220; McNish v. Stone, 15 Pa. St. 457; Whitcomb v. Hoyt, 30 Pa. St. 409; Brown v. Vandergrift, 80 Pa. St. 142; Duffield v. Hue, 129 Pa. St. 94, 18 Atl. 566; McKnight v. Gas Co., 146 Pa. St. 185, 23 Atl. 164; Oil Co. v. Fretts, 152 Pa. St. 451, 25 Atl. 732; Barnhart v. Lockwood, 152 Pa. St. 82, 25 Atl. 237; Bartley v. Phillips, 165 Pa. St. 328, 30 Atl. 842; Cowan v. Iron Co., 83 Va. 547, 3 S. E. 120; Iron Co. v. Trout, 83 Va. 397, 2 S. E. 713; Oil Co. v. Kelley, 9 Ohio Cir. Ct. 511; Eaton v. Gas Co., 122 N. Y. 416, 25 N. E. 981.

It follows from what we have said that the Elk Fork Oil & Gas Company, by virtue of the leases executed to Hill, have title to the oil and gas in and under the land as described in said leases, and also that the leases executed to William Johnston in 1889, covering the same land, and now claimed by Jennings, Guffey, Glatzau, Foster, and others, are invalid because of abandonment, and that the complainants have a right to have the cloud upon their title caused thereby removed by order of this court. The receivers will be directed to settle their accounts, and report to the court as soon as possible the moneys in their hands to the credit of this consolidated cause, so that proper disposition may be made of the same, and said receivers will be discharged, and the property in their custody will be turned over to the owners thereof. The restraining order granted on the filing of the cross bill by Foster, as well as the injunction issued when the cross bill was tendered by Jennings, Guffey, and Glatzau, will be dissolved. The injunction granted on the prayer of the Elk Fork Oil & Gas Company, restraining the defendants to the original suit from taking possession and operating the leases claimed by that company as set forth in the complainants' amended bill, as also the injunction issued against Foster when the amended and supplemental bill of complainants was filed, will be made perpetual. The court will enter a decree drawn on the lines indicated by this opinion.

JACKSON, District Judge, concurring.