**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LABOR READY, INCORPORATED, Respondent.**

No. 00–2064.

United States Court of Appeals, Fourth Circuit.

Argued: April 5, 2001.

Decided: June 1, 2001.

**ARGUED:** Kevin L. Carr, Spilman, Thomas & Battle, P.L.L.C., Charleston, WV, for Petitioner. Anne Marie Lofaso, National Labor Relations Board, Washington, DC, for Board. **ON BRIEF:** Niall Anthony Paul, Charles I. Woody, Spilman, Thomas & Battle, P.L.L.C., Charleston, WV, for Petitioner. Leonard R. Page, General, John H. Ferguson, Associate General, Aileen A. Armstrong, Deputy Associate General, Margaret A. Gaines, Supervisory Attorney, Sonya Spielberg, National Labor Relations Board, Washington, DC, for Board.

Before WILKINS, KING, and GREGORY, Circuit Judges.

Enforcement granted by published opinion. Judge WILKINS wrote the opinion, in which Judge KING and judge GREGORY joined.

## OPINION

WILKINS, Circuit Judge:

The National Labor Relations Board (NLRB) seeks enforcement of an order that, *inter alia*, bars Labor Ready, Incorporated from treating certain workers as non-employees for purposes of the company's no-solicitation policy. Labor Ready asks us to deny enforcement and to overturn the NLRB's finding that it engaged in unfair labor practices. We affirm the decision of the NLRB and grant its petition for enforcement.

### I.

#### A.

Labor Ready is a temporary employment agency with over 200 offices nationwide. Workers seeking placement through Labor Ready must fill out an application and complete certain orientation procedures, including safety training. Applications are kept on file, and workers who have submitted applications ("incumbent workers") return to the office whenever they desire an assignment. An incumbent worker who does not want an assignment on any given day is not obligated to request or accept one.

Assignments ordinarily last one day. Labor Ready branches observe either of two policies regarding the manner by which assignments are distributed; one policy allows workers to receive assignments by telephone, while the other requires workers to go to the Labor Ready office every morning and wait for assignments.[1] Those who receive assignments return to the office at the end of the day for their paychecks. At the end of each day, the worker is contractually "deemed to have quit." J.A. 463.

While in the waiting room, incumbent workers and new applicants are not permitted to engage in any form of solicitation. The following policy applies in Labor Ready offices:

### NO SOLICITATION POLICY

It is our objective to provide a comfortable work environment which allows employees to complete their tasks with the least amount of interruptions or disruptions. Thus Labor Ready has established the following policy:

— Nonemployees (including job applicants) are not allowed at any time to come upon Company premises for the purpose of any form of solicitation or literature distribution. This policy prohibits third parties or strangers from soliciting or handing out materials for any reason, including but not limited to, political, union, charitable, or similar activities. *For the purposes of this policy, applicants for employment, including but not limited to those waiting for a job assignment or referral, are considered nonemployees, strangers or third parties.*

— Employees are prohibited from distributing any form of literature or other materials in work areas. Employees are also prohibited from soliciting or distributing literature of any kind or for any cause during their assigned working time or soliciting an employee during that employee's working time at our site or a customer's site.

*Id.* at 485 (emphasis added).[2]

### B.

Donald Huff is a heavy equipment operator and an employee of the Affiliated Construction Trades Foundation, a union-affiliated organization. In 1996, Huff became involved in a unionization drive directed at Labor Ready and the businesses to which Labor Ready supplied temporary workers. As part of this effort, Huff submitted an application at the Labor Ready office in South Charleston, West Virginia. One week later, he brought in a busload of union members to file applications.

Huff received an assignment lasting several days in December 1996. Initially, Huff was paid at the end of each day, and then the assignment was renewed by telephone the next day. After a few days, however, he was issued a weekly time ticket; a few days after that, he received a paycheck for several days of work.

At some point, the South Charleston Labor Ready office changed its procedure for distributing assignments; whereas incumbent workers previously could receive

---

**1.** At oral argument, counsel for Labor Ready informed us that new branches typically allow telephone assignments at first and then switch to a policy requiring workers to come to the office for assignments.

**2.** The parties dispute whether Labor Ready ever had a broader prohibition against solicitation in effect. This question is not material to our resolution of the petition for enforcement, and accordingly we do not address it.

assignments by telephone, the new policy required them to appear at the office early in the morning and remain there to await placement. In response, Huff and three other men began circulating a petition at the Labor Ready office on December 30, 1996, requesting that Labor Ready resume telephone placements. The manager of the South Charleston office, Michael Tucker, directed them to stop, and they complied. After consulting with the union, however, Huff resumed circulating the petition. Tucker repeatedly ordered him to stop, but Huff and his associates refused, asserting that their activity was protected under the National Labor Relations Act (NLRA), 29 U.S.C.A. §§ 151–169 (West 1998).

The following week, there was a video camera set up on a tripod in the Labor Ready waiting room and pointed toward the table where Huff and his associates usually sat with their petition. Tucker told Huff the video camera was on but refused to explain why it was there. The next day, Huff found his regular table occupied and observed that the camera had been turned toward the only other available table in the waiting room.

Over the next several weeks, Huff continued organizing at the South Charleston Labor Ready office and extended his efforts to the office in Huntington, West Virginia. His activities culminated in a confrontation with Tucker on February 25, 1997. On that day, Tucker repeatedly told Huff to stop circulating his petition on Labor Ready premises, or Tucker would call the police. Huff refused, again claiming that his activities were protected under the NLRA. Initially, the video camera was not in the waiting room, but Tucker brought it out and set it up to record Huff's activities. Tucker then called the police. The police told Huff to leave the premises, and he did so.

As a result of this incident, Huff was removed from the roster of incumbent workers. When Huff subsequently returned his hard hat and boots to the South Charleston office, Tucker advised him that he was "permanently barred" from all Labor Ready offices nationwide. J.A. 351.

### C.

In response to Huff's banishment, the union filed a charge with the NLRB alleging various unfair labor practices. An administrative law judge (ALJ) found that Labor Ready had violated the NLRA in several respects. In particular, the ALJ found, based on two alternative rationales, that Labor Ready improperly treated Huff as a non-employee. The ALJ's broader rationale construed Supreme Court precedent to require that all job applicants be treated as employees for NLRA purposes. See id. at 4 (citing Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 182–87, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (holding that the NLRA prohibits employers from refusing to hire job applicants because they are union members)). The narrower rationale focused on the specific facts of this case: "[Huff] was ... an employee, because he had actually been sent to work by [Labor Ready], his application for employment was on file, and he was waiting at [Labor Ready's] office for another assignment, as [Labor Ready's] rule required." Id. (footnote omitted). In connection with this fact-specific approach, the ALJ determined that the Labor Ready policy requiring its workers to quit at the end of each day "was a rule ... only on paper and not in practice," because workers were sometimes assigned to jobs lasting several days or more and paid for multiple days of labor in a single paycheck. Id.

A three-member panel of the NLRB affirmed the decision of the ALJ. The panel generally relied on the ALJ's reasoning,

but added, "In adopting the [ALJ's] conclusion that [Labor Ready] violated [the NLRA] by its no-solicitation rules, we emphasize the particular facts of this case." *Id.* at 1. The panel further adopted the ALJ's order, which bars Labor Ready from restricting solicitation among incumbent workers;[3] prohibits video surveillance of employees; grants Huff reinstatement (at his election) and back pay; and mandates the posting of an announcement addressing these concerns. The NLRB now seeks enforcement of this order.

## II.

■ The NLRA secures the right of employees "to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C.A. § 157. Interference with this right constitutes an unfair labor practice. *See id.* § 158(a)(1). As interpreted by the Supreme Court, these provisions create a presumption that prohibitions against solicitation among employees are invalid, while a countervailing presumption protects the right of employers to exclude non-employee solicitors. *See Lechmere, Inc. v. NLRB,* 502 U.S. 527, 532–33, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992); *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 113, 76 S.Ct. 679, 100 L.Ed. 975 (1956). Thus, the validity of the restrictions enforced by Labor Ready depends on whether incumbent workers were "employees" for purposes of the NLRA.[4]

■ The NLRA defines the word "employee" to include "any employee," subject to specified exceptions. 29 U.S.C.A. § 152(3). We extend considerable deference to the NLRB's interpretation of this provision and its application of the provision to a particular worker or class of workers. *See NLRB v. Town & Country Elec., Inc.,* 516 U.S. 85, 89–90, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995); *Sam's Club, a Div. of Wal–Mart Stores, Inc. v. NLRB,* 173 F.3d 233, 239 (4th Cir.1999).

■ Here, it is undisputed that workers who receive assignments from Labor Ready are Labor Ready employees while at the job site. The sole question before us is whether that employee status abides overnight or, as Labor Ready maintains, the employment relationship is dissolved each evening and not renewed unless and until the worker receives another assignment.

There is scant case law addressing the question of whether an employment relationship is continuous or intermittent. Indeed, the only apposite case we have found is *NLRB v. Waterman S.S. Corp.,* 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704 (1940). In *Waterman,* a shipping company signed contracts called "articles" with each crew member; the articles were signed before each voyage and apparently expired when the voyage was completed. *See Waterman,* 309 U.S. at 210–11, 60 S.Ct. 493. The company and a union also entered into a collective bargaining agreement that, *inter alia,* described the workers' duties between voyages. *See id.* at 217, 60 S.Ct.

---

**3.** The order uses the phrase "employee applicants." *Id.* at 6. We construe this term to mean workers with applications on file, whom we have classified as "incumbent workers."

**4.** Labor Ready contends that, because its no-solicitation policy was declared facially invalid, the decision of the NLRB may be upheld only if we conclude that all job applicants must be treated as employees for all purposes. We disagree. The narrower question of whether incumbent workers are employees is properly before us, both because the Labor Ready policy expressly classifies incumbent workers as non-employees and because the NLRB opinion "emphasize[d] the particular facts of this case." J.A. 1.

493. While two ships were in drydock between voyages, the company replaced several crew members who were affiliated with a different union. *See id.* at 209, 60 S.Ct. 493. The NLRB held that these discharges amounted to unlawful discrimination on the basis of union preference. *See id.* The Supreme Court upheld this decision, noting in the process that the expiration of the discharged workers' articles did not terminate their employee status. *See id.* at 213–20, 60 S.Ct. 493.

■ Two relevant principles emerge from *Waterman.* First, as a matter of law, employee status under the NLRA may survive during the interval between the completion of one assignment and the commencement of another. This is so even when, as here, there is no formal "obligation of employer or employed to continue the relationship when the day's work is done." *Id.* at 219, 60 S.Ct. 493. In accord with this principle, courts have applied the NLRA to off-duty workers soliciting between shifts, *see NLRB v. S. Md. Hosp. Ctr.,* 916 F.2d 932, 935 (4th Cir.1990) (per curiam), and to a part-time worker who received assignments on an as-needed basis, *see NLRB v. Int'l Van Lines,* 409 U.S. 48, 50 n. 2, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972); these cases do not even mention the possibility that such workers lacked employee status. Significantly, the NLRA has also been applied to relations between temporary employment agencies and the workers who seek assignments from them. *See, e.g., NLRB v. W. Temp. Servs., Inc.,* 821 F.2d 1258, 1267 (7th Cir. 1987). These decisions demonstrate that incumbent workers could be employees for NLRA purposes while waiting at the Labor Ready office, even though they are not required to work on any particular day and do not perform any work or receive any compensation while awaiting placement. *See Waterman,* 309 U.S. at 215, 60 S.Ct.

493 (noting that "men standing idly by without pay at the end of a voyage still regard[ed] themselves in the employ of the shipowner").

■ The second principle that emerges from *Waterman* is that whether a worker retains employee status in the temporal interstices between assignments depends on whether, as a factual matter, such workers "are customarily continued in their employment with recognition of their preferential claims to their jobs." *Id.* at 219, 60 S.Ct. 493. It is somewhat difficult to apply this standard here, because most assignments obtained through Labor Ready are too brief to allow workers to acquire "preferential claims." On at least one occasion, however, Huff stayed with an assignment for several consecutive days. Furthermore, there was ample evidence that incumbent workers are "customarily continued in their employment" beyond the limited period Labor Ready is willing to acknowledge. In particular, Labor Ready retained the applications submitted by incumbent workers and allowed workers to keep equipment (such as Huff's boots and hard hat) for longer than the duration of their assignments. In light of these circumstances, the NLRB did not err in determining that Labor Ready and the incumbent workers engaged in a continuing relationship rather than a series of disconnected moments of employment.

This conclusion is not undermined by the fact that workers were, by the terms of their application, "deemed to have quit" each evening. The shipping company in *Waterman* invoked a comparable provision of the crew members' articles, under which all obligations were discharged when the crewmen received their wages at the end of a voyage; the Supreme Court, however, determined that this provision had a more limited effect than the company ascribed to it. *See id.* at 211–13, 60 S.Ct. 493. The

provision at issue here is not so ambiguous and must be accorded due weight, but it is not dispositive. *See Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 261 (4th Cir.1997) (treating express contract provision as one of several factors establishing that plaintiff was independent contractor rather than employee). Ultimately, this provision does not control the outcome here because, as the ALJ determined, it was contrary to Labor Ready's own practices. Here, as in *Waterman*, the realities of the workplace in question are more compelling than the contractual terms emphasized by the employer.

Finally, it is significant that Huff and other incumbent workers were present in the Labor Ready office every morning because a Labor Ready policy required them to be there in order to receive assignments. By conditioning the receipt of assignments on physical presence in the Labor Ready office, Labor Ready exerted a measure of control over incumbent workers between assignments. Such control is a key landmark on the boundary between employees and independent contractors. *See Cilecek*, 115 F.3d at 260. While that distinction goes to the *nature* of a particular relationship, rather than its existence *vel non*, this exercise of control over workers tends to refute Labor Ready's claim that there was no relationship whatsoever.

### III.

For the foregoing reasons, we affirm the NLRB's decision that Huff and other incumbent workers were "employees" within the meaning of 29 U.S.C.A. § 152(3). In light of this decision, we have no difficulty upholding the specific components of the NLRB's order. Because incumbent workers are employees, they have a statutory right to engage in solicitation; thus, the Labor Ready policy barring solicitation by such workers is invalid. Also, it is effec-

tively undisputed that, if Huff was an employee, his rights under the NLRA were violated by the videotaping of his activities in January 1997 and by his permanent banishment from Labor Ready offices the following month. Finally, Labor Ready has not challenged the specific remedies prescribed by the NLRB. Accordingly, we grant the petition for enforcement of the NLRB order.

*ENFORCEMENT GRANTED.*