PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CURTIS M. ADKINS,
    *Plaintiff-Appellant,*

  and

LEE AYERS; ANGELO BAILEY; DANIEL
BALLENGEE; BOBBY BELCHER;
LAWRENCE BENTZ; LARNIE BODDY,
JR.; JOHN BURGESS; ERIC CONLEY;
JAN COURTS; CHERYL DAVIS; GLENN
DAVIS; PHILLIP DAVIS; MICHAEL N.
DISHNER, SR.; JAMES DONALDSON;
ALEXANDER DORAN; BRUCE DULING;
BLAKE FRIEND; HARRY GAYNOR;
CHRISTOPHER GREENE; JAMES
HAIRSTON; GAIL HARPER; EDWARD
HARVEY; FLOYD D. HATFIELD, SR.;
LELAND L. HOLMAN; SHAUN JEFFRIES;
ERIC JUSTICE; JAMES JUSTICE; CRAIG
KUTZNER; LINDA KUTZNER; JOSEPH
LEGG; FREDDIE LEONARD; THOMAS
LEVANDOWSKI; TIMOTHY LILLARD;
FARRIS MALLO; JOEL MARIN; DONTAE
MASON; RODMAN L. MATTHEWS;
JOHN MCDANIEL; VALERIE MCGILL;
JASON MEANS; DWIGHT NEAL
MOSLEY; GEORGE PAPPAS; DONNA
PAULEY; DANNY PECK; BRIAN PENCE;
ASA PERPALL; GARY PULLEN;
TIMONTHY RAMSEY; LARRY RICHARDS;

   No. 01-2304

ANGELA RENEE ROTON; NORMAN G.
ROY, III; ROGER SMITH; ERTHEL
SMOOT; RUFUS SPILLMAN; ANDREW
STRUM; RONALD TEET; KENNETH
TERRELL; PAMELA THAXTON; GORDON
THOMAS; CRAIG TOLLEY; CHAD
WATSON; WILLIAM WILSON; RONNIE
S. ZORNES; TINA ROBERTS ZORNES,
          *Opt-in Plaintiffs-Appellants,*

v.

LABOR READY, INCORPORATED; LABOR
READY MID-ATLANTIC, INCORPORATED,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(CA-00-844-2)

Argued: June 4, 2002

Decided: August 30, 2002

Before WILKINSON, Chief Judge, WILKINS, Circuit Judge,
and Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

---

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Wilkins and Judge Goodwin joined.

---

**COUNSEL**

**ARGUED:** Mary Georgia McQuain, LAW OFFICES OF STUART
CALWELL, P.L.L.C., Charleston, West Virginia, for Appellants. Carl

H. Trieshmann, SCHNADER, HARRISON, SEGAL & LEWIS, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Stuart Calwell, LAW OFFICES OF STUART CALWELL, P.L.L.C., Charleston, West Virginia, for Appellants.

## OPINION

WILKINSON, Chief Judge:

Curtis Adkins filed suit against Labor Ready, Inc. and Labor Ready Mid-Atlantic, Inc. (collectively "Labor Ready") alleging violations of federal and state labor laws. Labor Ready responded with a motion to compel arbitration based on an arbitration agreement signed by Adkins. The district court granted the motion, *Adkins v. Labor Ready, Inc.*, 185 F. Supp. 2d 628 (S.D.W. Va. 2001), and dismissed the case. Because the arbitration agreement is enforceable and all of Adkins' claims are arbitrable, we affirm.

I.

Labor Ready is a temporary employment agency that provides manual day labor to companies throughout the United States. It has hundreds of dispatch offices, all of which operate under a strictly regimented "Work Today, Paid Today" employment procedure. Temporary employees report to work at the Labor Ready office before the start of the workday, where they wait on the premises until jobs are assigned to them. They receive work tickets at the home office and then travel to a Labor Ready customer's job site. At the end of each workday, the customer signs the employees' work tickets, whereupon the employees return to Labor Ready to receive immediate payment. Employees can choose payment either by check drawn upon a non-local bank or by cash. For cash payments, a fee of between one and two dollars is deducted.

Adkins alleges that Labor Ready's dispatch and payroll procedures violate the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, West Virginia's Minimum Wage and Maximum Hours Standards for Employees, W. Va. Code § 21-5C-1 *et seq.*, and West

Virginia's Wage Payment and Collection Act, W. Va. Code § 21-5-1 *et seq.* He brought this suit as a proposed FLSA class action, filing approximately sixty-three consent forms from current and former Labor Ready employees wishing to join the action as plaintiffs.

Adkins contends that Labor Ready employees were statutorily entitled to payment for waiting time at Labor Ready's dispatch office, travel time between that office and the assigned workplace, and time spent undergoing required training. Further, he claims that if this amount of time was added to each employee's workweek, many employees would be entitled to overtime pay. He also alleges that Labor Ready employees were entitled to compensation for the cost of commuting to and from job sites at the prevailing rate of $.35 per mile. Additionally, he asserts that Labor Ready's means of payment, involving a deduction for cash payment, was itself contrary to law.

Labor Ready filed a motion to compel arbitration and stay proceedings based on an arbitration agreement signed by Adkins and every other Labor Ready employee. This agreement, contained in Labor Ready's Policy Regarding Dispatch Procedures, Employment and Arbitration ("the Policy"), must be signed by all potential employees as part of the job application before they may join Labor Ready's pool of temporary workers. The Policy is contained within an enclosed box on the employment application. It provides in pertinent part:

> I understand that my employment with LABOR READY, INC. is on a day-to-day basis. That is, at the end of the work day, I will be deemed to have quit unless and until I request and receive a work assignment at a later date.
>
> I agree that any disputes arising out of my employment, including any claims of discrimination, harassment or wrongful termination that I believe I have against Labor Ready and all other employment related issues (excluding only claims arising under the National Labor Relations act [sic] or otherwise within the jurisdiction of the National Labor Relations Board) will be resolved by arbitration as my sole remedy. The arbitration shall be conducted by the American Arbitration Association under its Commercial Arbitration Rules and the decision of the arbitrator shall be

final and binding. I understand that Labor Ready also agrees to arbitrate in the same manner any claims which the company believes it has against me.

I HAVE READ AND AGREE TO THE ABOVE STATE-MENTS.

Relying on the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, Labor Ready argues that the arbitration agreement was valid, covered Adkins' claims, and should be enforced.

The district court agreed and ordered the parties to submit Adkins' claims to arbitration in accordance with the terms of the arbitration agreement. The court then dismissed the action on the ground that all of the issues presented in the suit were arbitrable. *See Choice Hotels Int'l v. BSR Tropicana Resort*, 252 F.3d 707, 709-10 (4th Cir. 2001). Adkins appeals.

## II.

The FAA reflects "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Underlying this policy is Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation. *Hightower v. GMRI, Inc.*, 272 F.3d 239, 241 (4th Cir. 2001). Accordingly, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Info. Sciences, Inc. v. Bd. of Tr. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989).

The FAA requires a court to stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. This stay-of-litigation provision is mandatory. A district court therefore has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview. *United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001).

Thus mindful of the "clear federal directive in support of arbitration," *Hightower*, 272 F.3d at 242, we proceed to the analysis of the district court's order compelling arbitration.

### III.

In the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). Adkins contests the second element, denying the existence of a binding contract to arbitrate this dispute.

It is clear that "even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997). Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). We turn initially, therefore, to West Virginia contract law to determine whether the employment application mandates arbitration of Adkins' claims as a contractual matter. We review the trial court's decision on this issue *de novo. See Arnold v. United Cos. Lending Corp.*, 511 S.E.2d 854, 860-61 (W. Va. 1998).

### A.

Adkins first argues that there was no exchange of consideration to support the formation of a contract based on the employment application. By its terms, however, the arbitration clause requires both Adkins and Labor Ready to arbitrate any employment-related claims either might have. Because "no consideration [is required] above and beyond the agreement to be bound by the arbitration process" for any claims brought by the employee, *Johnson v. Circuit City Stores*, 148 F.3d 373, 378 (4th Cir. 1998), Labor Ready's promise to arbitrate its own claims is *a fortiori* adequate consideration for this agreement.

Adkins argues that this promise was "illusory" but advances no convincing reasons to support this assertion. His contention that Labor Ready has no reciprocal rights against its employees under worker protection provisions, while obviously true, does not by itself demonstrate that Labor Ready's promise to arbitrate its own claims is meaningless. At bottom, Adkins appears to contend that Labor Ready could possess no conceivable claims against its at-will employees, ignoring the fact that in every employment relationship, each side bears reciprocal obligations to the other. *See, e.g.*, *Am. Jur. 2d Employment Relationship* § 222 (2002) (employee liable to employer for any profit received as the result of a breach of employee's duty of loyalty). There was plainly adequate consideration here to support the formation of a contract.

## B.

Adkins also asserts that the employment agreement was an unconscionable contract of adhesion under West Virginia law. He points to evidence in the record that many of the plaintiffs did not complete high school, were paid at or near the minimum wage by Labor Ready, live in low-income neighborhoods, and did not know what arbitration was when they signed the employment application. He further notes that Labor Ready is a large, sophisticated, international corporation that generated more than $850 million in revenues during the year before this suit was brought. In light of this gross disparity in bargaining power and the take-it-or-leave-it nature of the employment application, he argues that the arbitration agreement is unenforceable.

A ruling of unconscionability based on this analysis alone could potentially apply to every contract of employment in our contemporary economy. The West Virginia courts recognize that "it is not the province of the judiciary to try to eliminate the inequities inevitable in a capitalist society." *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 753 (W. Va. 1986). Unconscionability in West Virginia therefore requires both "gross inadequacy in bargaining power" and "terms unreasonably favorable to the stronger party." *Id.* at 753 (internal citations omitted). A finding "that the transaction was flawed . . . still depends on the existence of unfair terms in the contract. A litigant who complains that he was forced to enter into a fair agreement

will find no relief on grounds of unconscionability." *Arnold*, 511 S.E.2d at 861 n.6 (quoting *Troy Mining Corp.*, 346 S.E.2d at 753).

We therefore review the contract for any unfair terms, bearing in mind that "the grounds for revocation must relate specifically to the arbitration clause and not just to the contract as a whole." *Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999). Adkins' claim of unfairness hinges on his argument that the arbitration agreement forecloses redress of his underlying substantive rights. The agreement, however, does no such thing.

Certainly no agreement to arbitrate can be construed on its face as an inherent waiver of a litigant's statutory rights. The entire point of the FAA was to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). There is thus a clear federal command that courts cannot treat arbitration in general as an inferior or less reliable means of vindicating important substantive rights. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985). Nor is there any allegation that this specific arbitral forum is so procedurally unfair as to inject substantive bias into the process itself. *Hooters*, 173 F.3d at 938.

Instead, Adkins argues that the arbitration clause forecloses redress of his rights because it effectively precludes access not only to the courts, but even to the arbitration forum itself. He contends it does so by the interaction of two factors: the fee structure of Labor Ready's arbitration procedure and its preclusion of class actions. Adkins claims that arbitration costs are so high and the amounts at stake for each individual plaintiff so low that no plaintiff would be willing to gamble on victory in arbitration.[1] He further asserts that plaintiffs cannot circumvent this problem by aggregating their claims for the sake of economic efficiency because Labor Ready's arbitration procedure does not permit class actions.

---

[1] Adkins does not, however, argue that he would pay more in fees than he could receive in damages. It is undisputed that plaintiffs prevailing under the FLSA are awarded both attorney's fees and the cost of the action, 29 U.S.C. § 216(b), even in arbitration. *See Gilmer*, 500 U.S. at 27-28 (litigants retain all substantive statutory rights in arbitral forum).

It is certainly possible that "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000); *cf. Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945) (contractual waiver of FLSA rights void as against public policy). However, where a party "seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree*, 531 U.S. at 92. Adkins has not come close to satisfying that burden here.

Adkins makes no showing of the specific financial status of any of the plaintiffs at the time this action was brought. He provides no basis for a serious estimation of how much money is at stake for each individual plaintiff. In fact, he does not even provide any evidence about the most basic element of this challenge: the size of the allegedly "prohibitive" arbitration fee itself. Adkins' plea that he could not do this because the district court cut off discovery is unconvincing. It was within his power to obtain this information by simply investigating the option of arbitration in the first place. He cannot seriously claim to be in court because the arbitration fee is too high at the same time that he pleads ignorance about what the actual amount of the arbitration fee might be.

Nor are we moved to a contrary conclusion by the fact that two district courts have found specific cost-sharing provisions in other arbitration agreements to be unconscionable. *Giordano v. Pep Boys—Manny, Moe & Jack, Inc.*, No. 99-1281, 2001 WL 484360 (E.D. Pa., Mar. 29, 2001); *In re Knepp*, 229 B.R. 821 (Bankr. N.D. Ala. 1999). Merely listing "fees incurred in cases involving other arbitrations" does not indicate that Adkins himself "would in fact have incurred substantial costs in the event [his] claim went to arbitration." *Green Tree*, 531 U.S. at 91 n.6.

Adkins' failure to carry his burden of proof under *Green Tree* renders his further complaint about the inability to bring a class action moot. As the Third Circuit has held, "simply because judicial remedies are part of a law does not mean that Congress meant to preclude parties from bargaining around their availability." *Johnson v. West Suburban Bank*, 225 F.3d 366, 377 (3d Cir. 2000) (Truth in Lending

Act claims are arbitrable even if class action mechanism is unavailable); *see also Randolph v. Green Tree Fin. Corp.-Alabama*, 244 F.3d 814 (11th Cir. 2001) (same). Adkins points to no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute. His inability to bring a class action, therefore, cannot by itself suffice to defeat the strong congressional preference for an arbitral forum.

C.

Adkins' third contractual challenge lies in his assertion that the contract is grounded in a mutual mistake. Specifically, he argues that the parties were mistaken about whether the contractual relationship actually terminated at the end of each day. The Policy provides that "at the end of the work day, [employees] will be deemed to have quit unless and until [they] request and receive a work assignment at a later date." Adkins argues, however, that we have previously held this same "deemed to have quit" provision to be without legal force. *See NLRB v. Labor Ready, Inc.*, 253 F.3d 195 (4th Cir. 2001) ("deemed to have quit" clause does not terminate employee status under NLRA provisions guaranteeing employees' right to unionize). In light of that decision, Adkins argues, "the 'realities of the workplace' at Labor Ready were different from the terms and conditions set out in the employment application." He contends that this constitutes a mutual mistake as to a material assumption which underlies a contractual agreement.

Even if Adkins' interpretation of *NLRB v. Labor Ready* were correct, this argument misconceives the nature of mutual mistake. In West Virginia, the doctrine of mutual mistake applies where parties enter into a contract "while laboring under a mistake of material *fact*." *Capitol Chrysler-Plymouth v. Megginson*, 532 S.E.2d 43, 49 (W. Va. 2000) (quoting *Brannon v. Riffle*, 475 S.E.2d 97, 101 (W. Va. 1996)) (emphasis added). But the court's decision in *NLRB v. Labor Ready* was a conclusion of law, not a determination of fact. We cannot accept the novel proposition that litigants can use a court's reading of a contract as a bootstrap to invalidate that same contract on the basis of mutual mistake. Such a principle would render the act of judicial contract interpretation equivalent to rescission whenever one party

disagrees with the outcome. Neither of the cases cited by Adkins support his argument. *McGinnis v. Cayton*, 312 S.E.2d 765 (W. Va. 1984) (mistaken appraisal of value of natural gas); *Bluestone Coal Co. v. Bell*, 18 S.E. 493 (W. Va. 1893) (mistaken belief about existence of coal veins on leased property). Both cases involved mutual mistakes of fact, and Adkins fails to allege any mistake of fact in this case.

### D.

Adkins next contends that even if the arbitration agreement initially created a binding contract, that contract terminated at the end of the first day and therefore does not require arbitration of his claims. He begins with the incontestable proposition that the FAA applies only to written agreements to arbitrate a dispute. 9 U.S.C. § 2. He further notes that the only written agreement in this case was the Policy that Adkins signed on his first day at Labor Ready. Since that Policy also included the "deemed to have quit" clause, Adkins contends that the contract necessarily terminated at the end of that first day — and with it, any agreement to arbitrate. Moreover, he argues that even if the terms of the original oral contract implicitly rolled over to a new oral contract commencing at the start of each working day, any such contract was not written and is therefore not covered by the FAA.

This argument confuses two distinct concepts. It is true that the *employment* was deemed to terminate at the end of each day for such purposes as determining at-will employee status. It is an entirely different matter to argue, however, that the *contract* governing the interactions over time between these two economic actors likewise terminated after each day. The employment application does more than govern a single day's work. Rather, it sets the framework for the entire business relationship between Labor Ready and its incumbent workers, creating the ground rules that will govern their interactions both before and after job assignments have actually been parceled out. This is demonstrated by its extensive discussion of such issues as confidentiality, attendance policies, sign-in procedures, down time usage, and procedural requirements for the daily assignment process. Indeed, Adkins concedes as much when he acknowledges that "the incumbent workers of Labor Ready engaged in a continuing employment relationship with Labor Ready rather than a series of disconnected

moments of employment." In the same sense that "employee status [at Labor Ready] abides overnight" for the purposes of the NLRA notwithstanding the "deemed to have quit" clause, *NLRB v. Labor Ready*, 253 F.3d at 199, the Policy governing the rules of engagement between Labor Ready and its incumbent workers also continues in force until the relationship itself is severed.

E.

Finally, Adkins contends that since the agreement to arbitrate was contained in an employment application rather than a post-hire writing, it cannot create binding contractual obligations. This argument is squarely foreclosed by *Circuit City Stores v. Adams*, 532 U.S. 105 (2001). In that case, the Supreme Court explicitly held that an arbitration agreement contained in an employee application compelled the arbitration of the signer's employment discrimination claims. *Id.* at 109-10. We see no reason to reach a different result with the employment application in the present case.

This argument actually bears an unfortunate similarity to many of Adkins' efforts throughout this litigation. Many of Adkins' claims invite us to push the parameters of state law so as to frustrate the intent of the FAA. This in turn implicates the Supremacy Clause at its core. The FAA's "liberal federal policy favoring arbitration agreements," *Moses Cone*, 460 U.S. at 24, means that states cannot single out arbitration agreements for disparate treatment under their laws. If we were to stretch West Virginia contract law to invalidate this arbitration agreement, we would be doubly guilty of overstepping our bounds: not only in expanding state precedent, but by doing so in pursuit of an outcome that the state itself is not permitted to authorize.

IV.

Even if the arbitration agreement satisfies West Virginia's law of contract formation, Adkins argues that it is nonetheless unenforceable on several unrelated statutory grounds. We find none of them convincing.

A.

Adkins first contends that § 1 of the FAA exempts him from the requirements of that statute. Under § 1, the FAA's pro-arbitration policy does not apply to disputes arising out of "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. This exception "exempts from the FAA only contracts of employment of transportation workers." *Circuit City v. Adams*, 532 U.S. at 119; *see also O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 274 (4th Cir. 1997) (limiting § 1's coverage to "workers actually involved in the interstate transportation of goods"). Adkins argues that because some of the plaintiffs were occasionally assigned ("and/or are subject to being so assigned") to clients in the transportation industry, his case falls within the category of transportation workers more generally and is therefore exempt from the FAA.[2]

As the district court noted, Labor Ready's employees work in the areas of "construction, landscaping, warehousing, catering, moving, hotel, stevedoring, [and] light industrial markets." *Adkins*, 185 F. Supp. 2d at 643. Some categories in this laundry list can be construed as including work related to the interstate transportation of goods. However, § 1 of the FAA represents a narrowly targeted exception to a well-established, broad preference in favor of arbitration. As such it must be construed narrowly. *Circuit City v. Adams*, 532 U.S. at 118. Adkins does not contend (and the evidence does not show) that a majority or even a plurality of the plaintiffs' daily assignments were in transportation-related industries. In fact, under the apparent principle of Adkins' complaint, if a Labor Ready employee had been assigned to even a single transportation-related job during his entire tenure at the company, he should be exempted from the FAA. To apply the term "transportation workers" in that way stretches it past the breaking point. Plaintiffs thus do not qualify as transportation workers and are therefore not entitled to exemption from the FAA under § 1.

---

[2]We cannot take seriously Adkins' further claim that he is a transportation worker because he occasionally took other Labor Ready employees with him to a job site.

B.

Adkins further contends that the FLSA itself precludes mandatory arbitration of his federal claims because FLSA claims are categorically immune from mandatory arbitration. For this argument to succeed, he must show that Congress intended to preclude waiver of a judicial forum for FLSA claims by pointing to the text of the FLSA, its legislative history, or an "inherent conflict" between arbitration and the FLSA's underlying purposes. *See Gilmer*, 500 U.S. at 26.

Adkins does not argue that either the statutory text or legislative history evince a congressional intent to require courtroom resolution of FLSA claims. He contends instead that the purposes and structure of the FLSA directly conflict with the FAA's pro-arbitration policy. However, the FLSA's remedial purposes and enforcement scheme are very similar to that of the Age Discrimination in Employment Act (ADEA), a statute that the Supreme Court has already concluded does not pre-empt the FAA. *See Gilmer*, 500 U.S. at 23. Not only are the FLSA's purposes broadly remedial in the same sense as the ADEA, *compare* 29 U.S.C. § 202 *with* 29 U.S.C. § 621, but the ADEA actually incorporates large sections of the FLSA's enforcement structure by reference. 29 U.S.C. § 626(b).

Adkins attempts to distinguish the two by noting that ADEA complainants must begin by filing a formal claim with the EEOC before commencing court action. *See* 29 U.S.C. § 626(d). But this fact alone hardly compels a different "inherent conflict" analysis under the FLSA than under the ADEA. Certainly it does not indicate, as Adkins seems to suggest, that access to the courts is somehow more important for FLSA plaintiffs than for ADEA plaintiffs. Since the Supreme Court has already held that the FAA is compatible with the ADEA, *Gilmer*, 500 U.S. at 27, we reject Adkins' structural argument that there is an inherent conflict between the FAA and the FLSA.

The cases Adkins cites in support of this proposition are likewise inapposite. In particular, *Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728 (1981), was limited to the case of collective-bargaining arbitration and was thus rooted in substantive concerns that simply do not apply to the present case. *See, e.g.*, *id.* at 742. And of course *Barrentine* was followed by *Gilmer*'s and *Adams*' endorsement of arbitra-

tion as a substantively equivalent means of resolving statutory claims pertaining to employment. *See Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319-20 (9th Cir. 1996); *Carter v. Countrywide Credit Indus.*, 189 F. Supp. 2d 606, 609-14 (N.D. Tex. 2002). We therefore hold that FLSA claims may properly be resolved in mandatory arbitration proceedings.

## C.

Adkins concludes by arguing that his state statutory claims may not be arbitrated because West Virginia precedent precludes arbitration of human rights claims. *See Copley v. NCR Corp.*, 394 S.E.2d 751, 756 (1990). Whatever force *Copley* may formerly have had, its ruling on arbitration cannot trump *Gilmer* and *Circuit City v. Adams*. The Supremacy Clause precludes any argument to the contrary.

## V.

Adkins' claims amount to little more than an attempt to undermine repeated pronouncements by Congress and the Supreme Court that federal law incorporates a liberal policy favoring arbitration agreements. A refusal on our part to heed these pronouncements would be a dereliction of our duty under law. The judgment of the district court is therefore

*AFFIRMED*.